# EXHIBIT B

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts <br> The Superior Court |  |
|---|---|---|---|
| | | COUNTY Suffolk Superior Court (Boston) | |

| Plaintiff | Rawan Barakat | Defendant: | Walgreens Co. |
|---|---|---|---|
| ADDRESS: | 63 Avalon Road, West Roxbury, MA 02132 | ADDRESS: | 825 Morton Street, Mattapan, MA 02126 |
| Plaintiff Attorney: | Gary M. Feldman, Esq. | Defendant Attorney: | Ryan W. Jaziri, Esq. |
| ADDRESS: | Davis, Malm & D'Agostine, P.C. | ADDRESS: | Morgan, Brown & Joy |
| | One Boston Place, 37th Floor, Boston, MA 02108 | | 200 State Street, 11th Floor, Boston, MA 02109 |
| BBO: | 162070 | BBO: | 681512 |

### TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B22 | Employment Discrimination | F | ☒ YES ☐ NO |

*If "Other" please describe:

Is there a claim under G.L. c. 93A?  ☐ YES  ☒ NO

Is there a class action under Mass. R. Civ. P. 23?  ☐ YES  ☒ NO

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS

A. Documented medical expenses to date
  1. Total hospital expenses
  2. Total doctor expenses
  3. Total chiropractic expenses
  4. Total physical therapy expenses
  5. Total other expenses (describe below)

Subtotal (1-5): $0.00

B. Documented lost wages and compensation to date  $150,000.00
C. Documented property damages to date
D. Reasonably anticipated future medical and hospital expenses
E. Reasonably anticipated lost wages  $333,000.00
F. Other documented items of damages (describe below)  $500,000.00

Emotional Distress

TOTAL (A-F): $983,000.00

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

Lost wages and benefits and emotional distress.

### CONTRACT CLAIMS

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | | |
| | Total | |

Signature of Attorney/Unrepresented Plaintiff: X [signature]  Date: May 26, 2022

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney/Unrepresented Plaintiff: X [signature]  Date: May 26, 2022

SC0001: 1/22/2021     www.mass.gov/courts     Date/Time Printed:05-26-2022 12:25:38

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.	SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 2284CV01166 F

)
RAWAN BARAKAT,	)
	)
	Plaintiff,	)
	)
v.	)
	)
	)
WALGREENS CO.,	)
	)
	Defendant.	)
	)

RECEIVED

MAY 26 2022

SUPERIOR COURT-CIVIL
MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE

## COMPLAINT AND JURY DEMAND

### Introduction

1. During her employment by Defendant Walgreens Co. ("Walgreens" or "Defendant"), Plaintiff Rawan Barakat ("Ms. Barakat") was subjected to severe and pervasive discrimination based on her race, national origin, and disability.

2. Beginning in 2019, Ms. Barakat's direct supervisor, Jennifer Johnson ("Ms. Johnson"), made offensive comments conveying disgusting stereotypes about Ms. Barakat's race and national origin.

3. Ms. Barakat was an excellent Walgreens employee for over 15 years and consistently received exemplary performance reviews. However, when Ms. Johnson became her supervisor, Ms. Barakat began receiving negative reviews tainted by Ms. Johnson's bigotry. Ms. Johnson also secretly issued written warnings based on falsehoods that she presented, for the first time, at Ms. Barakat's annual performance review while denying Ms. Barakat an opportunity to address the baseless accusations.

4. When Ms. Barakat complained to the Human Resources department, Walgreens unlawfully retaliated against her in several ways, including by issuing a biased performance review, issuing warnings based on falsehoods, and depriving her of an opportunity to train the staff at a newly acquired pharmacy.

5. Walgreens subjected Ms. Barakat to pervasive discrimination, retaliation, and a hostile work environment. Walgreens' conduct was intolerable and caused Ms. Barakat to undergo elective eye cataract surgery to remove herself from Walgreens' hostile work environment. Unfortunately, the cataract surgery was unsuccessful and disabled Ms. Barakat from being able to work. As a direct result of Walgreens' unlawful conduct, Ms. Barakat has suffered lost wages, severe emotional distress, and other damages.

## Parties

6. Plaintiff Rawan Barakat is an individual residing at 63 Avalon Road W. Roxbury, MA 02132.

7. Defendant Walgreens Co. is a corporation organized under the laws of Delaware. It has numerous locations throughout the Commonwealth, including several within Suffolk County.

## Jurisdiction and Venue

8. Jurisdiction is proper pursuant to G.L. c. 212, § 4.

9. Venue is proper pursuant to G.L. c. 223, §§ 1, 8.

## Factual Background

### Ms. Barakat's Employment at Walgreens

10. Ms. Barakat was born and raised in Palestine before emigrating to the United States in June 1994.

11. Ms. Barakat earned a B.S. degree in biology and a doctorate in pharmacy, also known as a PharmD, from Massachusetts College of Pharmacy and Health Sciences.

12. In October 2004, Walgreens hired Ms. Barakat as a pharmacist.

13. In March 2006, Walgreen promoted Ms. Barakat to Pharmacy Manager for its Roslindale, Massachusetts location. On or around December 21, 2009, she transferred into the position of Pharmacy Manager at Walgreens' Mattapan, Massachusetts, location.

### Ms. Barakat's Supervisor

14. Ms. Barakat was an exemplary employee and consistently received excellent annual performance reviews of "meets expectations" or "exceeds expectations."

15. In June 2019, Jennifer Johnson ("Ms. Johnson") became Ms. Barakat's direct supervisor and the Mattapan Store Manager.

16. Ms. Johnson is a white female.

### Ms. Barakat Suffers Discrimination Based on Her Race and National Origin

17. After Ms. Johnson took over as Store Manager, Ms. Barakat became subjected to harassment, discrimination, and a hostile work environment because of her race and national origin.

18. Ms. Barakat's store was rife with unprofessional behavior by other department managers and employees towards customers and employees, none of whom were disciplined or Arab. This unprofessional behavior included employees arguing in front of customers and employees arguing with customers. The front of the store was typically a mess and not in compliance with Walgreens' standards in numerous respects. Yet, upon information and belief, only Ms. Barakat, the sole Arab, was singled out for discipline by Ms. Johnson.

19. Ms. Johnson repeatedly made discriminatory, hostile, and inflammatory statements about Ms. Barakat's Arab race and nationality.

20. Among other things, Ms. Johnson falsely accused Ms. Barakat of demonstrating aggressive and hostile behavior, which she expressly attributed to her Arab heritage.

21. Ms. Johnson's hostile and discriminatory comments to Ms. Barakat included: (1) "I know your culture is like that; I spent seven years in Egypt"; and (2) "I know you're Arab, you have a strong personality, you guys are combative and defensive."

22. Ms. Johnson's comments were objectively offensive, and Ms. Barakat considered them deeply hurtful.

23. In 2019, Walgreens began conducting pharmacy department inspections without notifying Ms. Barakat about the inspections. Before Ms. Johnson became her store manager, Walgreens had consistently notified her when it was conducting a pharmacy inspection. It also promptly provided her with the results of each inspection.

24. However, once Ms. Johnson became the store manager, Walgreens began conducting secret inspections and creating bogus critiques of Ms. Barakat based on these inspections. Ms. Johnson and other store personnel refused to discuss these baseless critiques with Ms. Barakat.

25. These false critiques, among other deceptive conduct by Ms. Johnson, were a pretext designed to prevent Ms. Barakat from advancing her career by effectively blocking opportunities for promotion. Ms. Johnson also used these critiques as a pretext to subject Ms. Barakat to unwarranted discipline.

26. A Walgreens employee, Ms. McGauley-Kebbeh, provided a written statement to Walgreens corroborating that Ms. Johnson said Ms. Barakat is "very aggressive and over-controlling" and "that is the Arab in her." A copy of this statement is attached as Exhibit A.

27. A second Walgreens employee, Talitha Bannister, provided a written statement (attached as Exhibit B) in which she wrote:

   a. "Lately everything Rawan is doing is all of a sudden wrong or needs correction and she has never had issues or problems at this pharmacy. I have been working with Rawan for many years and she has always been honest and cared about her patients and did everything she can to make f\sure all the needs are met an always pushed us to promote what the Company wants."

   b. "In all, there have never been problems at this pharmacy and I personally feel like Rawan is being watched all the time…"

   c. "It seems like the only part of the store that is being held responsible is the pharmacy because the bathrooms are disgusting the lockers are broken, the front store has hazards on the floor and totes that don't get worked and many other issues but nobody seems too worried about them because all the focus is on the pharmacy."

   d. "I personally feel that Jennifer and Holy are trying to make Rawan leave Walgreens because it is always something and it never was like this before they took over the store."

28. Walgreens validated the accuracy of Ms. Barakat's central claim that Ms. Johnson subjected her to harassment and discrimination based on her Arab heritage by disciplining Ms. Johnson.

29. Ms. Johnson's derogatory remarks about her national origin and race constitute direct evidence of discriminatory animus against Ms. Barakat.

30. Ms. Barakat was the only Arab employed by Walgreens at the Mattapan store during Ms. Barakat's tenure.

31. Upon information and belief, there were no Arab employees at the Gallivan Blvd. store where Ms. Johnson worked when Ms. Barakat was employed.

32. Upon information and belief, six (6) Boston area Arab managers left Walgreens' employ during Ms. Barakat's employment.

### Ms. Barakat Was Subjected to Discrimination Based on her Handicap

33. Beginning in July 2019, Walgreens discriminated against Ms. Barakat and subjected her to a hostile work environment because of her handicap.

34. Ms. Barakat has a history of retinitis pigmentosa in both eyes. The disease began to worsen in 2017, limiting her ability to drive. This disorder involves a breakdown and loss of cells in the retina, causing night blindness and a progressive loss of peripheral vision. It causes Ms. Barakat to have substantial difficulty performing certain everyday tasks, including seeing, driving, and walking without assistance. While the condition did not affect her ability to do her job, it made it difficult to commute to and from work, especially during evening or night hours.

35. Ms. Barakat disclosed her handicap to Walgreens' Regional District Manager, Holly Knight ("Ms. Knight"), in or about July 2019, when Ms. Barakat had to decline a promotion to Stoughton because of her driving limitations from retinitis pigmentosa.

36. Since learning of her handicap and her inability to drive at night, Walgreens made it more difficult for Ms. Barakat to work. Specifically, it repeatedly ordered her to change her work schedule by adding more night shifts.

37. Ms. Johnson has also commented on Ms. Barakat's handicap. After learning of her retinitis pigmentosa condition in or around July 2019, Ms. Johnson asked Ms. Barakat why she was still working at Walgreens in light of her eye condition.

### Walgreens Refuses to Grant a Reasonable Accommodation

38. Walgreens knew that Ms. Barakat's disability prevented her from driving at night.

39. With full knowledge of Ms. Barakat's medical condition and her inability to drive, beginning in November 2019, Ms. Johnson initiated a campaign to force a change in the shift schedule to require Ms. Barakat to work additional night shifts for a total of three closing shifts.

40. On November 7, 2019, Ms. Barakat put Walgreens on notice that her medical condition made it impossible for her to work additional night shifts. Ms. Johnson's discriminatory intent in demanding extra night shifts is evident because the current schedule met the needs of the other pharmacists in the department and, more importantly, followed Walgreens' Fair Scheduling Policy. Walgreens' Human Resources department confirmed that the current schedule met Walgreens' requirements.

41. Despite the preceding, Ms. Johnson continued to harass Ms. Barakat about changing the schedule. On November 7, 2019, Ms. Barakat's counsel sent an email to Walgreens Regional HR Manager, which included the following about the shift schedule issue:

> Dr. Barakat's managers know Dr. Barakat's retinitis pigmentosa condition. Walgreens knows this vision disease prevents Dr. Barakat from driving at night…yesterday Ms. Johnson demanded that Dr. Barakat present a new shift schedule by tomorrow with Dr. Barakat taking the closing position on two nights per week. Ms. Johnson stated this is necessary to "streamline" the area. Dr. Barakat developed the current schedule with the input and agreement of her staff pharmacist, which follows Walgreens' "fair scheduling" policy. The current schedule, where Dr. Barakat closes one night per week (not including her every other weekend coverage), was requested by her staff pharmacist and has been approved by the scheduling department. Ms. Johnson admitted that the schedule meets the "fair scheduling" policy, but despite that admission has ordered Dr. Barakat to submit a new schedule by tomorrow with Dr. Barakat in a closing position two nights per week. Because her vision disease prevents her from driving at night, it is difficult for Dr. Barakat to make family arrangements to work a closing shift. She has made the arrangements for the one night per week, but she cannot arrange for a second night.

> Ms. Johnson knows of Dr. Barakat's vision disease and driving limitations. Given that the current schedule is acknowledged to meet Walgreens' fair scheduling policy, follows the scheduling preference of the other staff pharmacist, was approved by the scheduling department, Ms. Johnson's conduct demonstrates discriminatory intent and contributes to the hostile environment Dr. Barakat has been subjected to at Walgreens…at this time we request that Walgreens immediately withdraw any requirement that Dr. Barakat submit a new schedule as demanded by Ms. Johnson.

42. To ensure her safety and continued ability to work, she requested a reasonable accommodation that Walgreens maintain her then-existing schedule. This schedule both: (a) complied with Walgreens' fair scheduling policy; and (b) accommodated a staff pharmacist at Walgreens who preferred working the night shifts.

43. Walgreens ignored Ms. Barakat's request for accommodation on the scheduling issue. On Wednesday, January 22, 2020, the District Manager and Ms. Johnson met with Ms. Barakat, demanding that she submit a new shift schedule showing her taking closing shifts per week by the following Monday. Ms. Barakat was not aware of any resolution of the scheduling issue before she went on medical leave in February 2020.

### Ms. Barakat is Subjected to Biased Performance Reviews

44. Before Ms. Johnson became the Mattapan store manager, Walgreens' regular practice was to complete annual performance reviews every August for the year ending August 31. Ms. Barakat received these reviews every year from her direct supervisor.

45. However, for her 2019 annual review, Ms. Barakat had to make several attempts to schedule a meeting with Ms. Johnson, who refused to respond to these requests.

46. After several requests to schedule her annual review, Ms. Johnson finally responded, and Ms. Barakat's annual performance review was scheduled for October 18, 2019.

8

Because this would be her annual review, her store manager through June 2019, Nick Martel ("Mr. Martel"), also attended the meeting.

47. Much to her surprise, Ms. Johnson did not discuss Ms. Barakat's annual review at the meeting. Instead, Ms. Johnson used the meeting to smear Ms. Barakat in front of Mr. Martel by presenting two written warnings containing false and misleading information. Ms. Johnson had not previously shared these warnings with Ms. Barakat and instead decided to "ambush" Ms. Barakat during her annual review.

48. One warning falsely claimed that Ms. Barakat failed to follow directions concerning the use of CORE workflow. The second written warning claimed Ms. Barakat made unprofessional comments in front of subordinates about the District Manager and that Ms. Barakat acted unprofessionally with other pharmacists. Both written warnings stated that any further "violations" would lead to further disciplinary action, including termination.

49. The October 18 review meeting started late. Then, due to time constraints with Mr. Martel's schedule, the written warnings were presented in a haphazard and rushed manner. Ms. Barakat was denied a fair opportunity to dispute the contents of the warnings or even have a substantive discussion about them.

### Ms. Barakat Suffers Retaliation After She Complains to Human Resources

50. On or about October 18, 2019, Ms. Barakat contacted Walgreens' human resources department and reported Walgreens' discrimination and harassment because of her race, national origin, and handicap.

51. On October 21, 2019, Ms. Barakat met with Ms. Johnson in her office to discuss the false written warnings. Ms. Barakat told her there was no basis for issuing a written warning for not complying with CORE requirements. She also reminded Ms. Johnson that they had

9

previously discussed this issue in September 2019 after Ms. Barakat discovered Ms. Johnson had conducted a pharmacy department review without her knowledge while making several false accusations about Ms. Barakat's performance and the pharmacy department as a whole (including falsely accusing Ms. Barakat of not meeting CORE requirements).

52.     At that September 2019 meeting, Ms. Barakat stated she was following CORE workflow requirements and, according to Walgreens' Help Desk, Ms. Barakat had a 100% score. Ms. Barakat had repeatedly asked Ms. Johnson to articulate her requirements since, according to Walgreens, she was already in full compliance.

53.     During the October 21, 2019, meeting, Ms. Johnson criticized her personality by using ethnic stereotypes associated with her Arab heritage. She said that because Ms. Barakat is an Arab, she had a "strong personality," and she was "combative."

54.     Ms. Johnson seized upon these stereotypes and warned her to think about how she was behaving. Ms. Barakat asked Ms. Johnson to stop using Arab stereotypes when discussing her behavior and that she was demonstrating antagonism towards her and her ethnic background. She told Ms. Johnson that her comments made her uncomfortable coming to work. Ms. Barakat also told Ms. Johnson that there was a lack of communication because Ms. Johnson refused to clarify her expectations. Ms. Barakat said she was concerned that this refusal to provide specific direction was designed to "set her up" so she could eventually terminate Ms. Barakat.

55.     Ms. Barakat refused to sign the performance warnings because of their falsity. She had never received any verbal notice about these issues, contrary to Walgreens' policies and disciplinary practices.

56.     Despite Ms. Barakat's request for more information, Walgreens refused to provide more information or an opportunity for Ms. Barakat to ask questions about the false

10

accusations. She was never provided reasonable time to discuss the allegations of the warnings with Ms. Johnson or any other Walgreens supervisor. Ms. Barakat communicated to Walgreens that it was becoming "increasingly difficult to work in this environment" and felt that she was being pushed out of Walgreens by her managers.

57. This hostile treatment was in direct retaliation because Ms. Barakat complained to Walgreens' HR department.

58. On October 25, 2019, Ms. Barakat met with Ms. Johnson for her annual performance review. This meeting should have covered the period through August 2019. Her previous Store Manager, Mr. Martel, had supervised her until July 2019 and, on information and belief, had scored her overall performance as a "4-Exceeds Expectations."

59. Although she had supervised her for only one month as of August 2019, on or around September 27, 2019, Ms. Johnson changed the review. She issued Ms. Barakat a 2.7 score of "partially meets" annual performance review without allowing her to challenge or even discuss the performance review.

60. The 2.7 performance rating was the worst during Ms. Barakat's tenure at Walgreens.

61. Ms. Johnson's rating was the only time Ms. Barakat received a score of less than 3.0. Ms. Johnson knew or should have known that a score of 2.8 or below for two (2) consecutive years results in an automatic PIP, which can lead to termination in 60 days. In addition, to receive a promotion, Ms. Barakat needed at least a "meets expectations" score of 3.0 or higher.

62. Shortly before September 27, 2019, Ms. Barakat contacted Walgreens HR to inquire about her CORE performance and whether she complied with Walgreens standards. HR confirmed Ms. Barakat was 100% in compliance.

63. Ms. Barakat strongly disagreed with this review, which was likely motivated by Ms. Johnson's discriminatory animus, and refused to sign the review. This was the first time in her fifteen (15) years as a Walgreens employee that Ms. Barakat had received a "partially meets" review.

### Ms. Barakat Continues to Complain to Human Resources

64. After receiving the downgraded performance review, Ms. Barakat called HR again on October 25, 2019, to complain that she had been unfairly targeted by Ms. Johnson based on her national origin, race, and handicap.

65. In or about 2017-2018, Walgreens acquired Rite-Aid. In 2019, as part of Walgreens' integration efforts, certain Walgreen's pharmacy locations were designated as training locates for Rite Aid pharmacists. Ms. Barakat's pharmacy was one of the sites selected to be a training site, which was a great compliment to her work as the pharmacy manager.

66. After the training had been publicly announced and after Ms. Barakat had been contacted directly by the Rite Aid store, Walgreens suddenly canceled the training in January 2020. Ms. Barakat was given no explanation for this cancellation, which was done, upon information and belief, to retaliate against Ms. Barakat after she complained to HR.

### Walgreens Refuses to Investigate Ms. Barakat's Complaints

67. Despite her complaints of discrimination and harassment, Ms. Barakat's concerns were not promptly investigated or addressed in any meaningful way.

68. Walgreens failed to investigate her complaints for several months. When Walgreens finally began its so-called "investigation," it refused to share the results with Ms. Barakat, including whether it took any steps to remediate the hostile and discriminatory workplace or discipline Ms. Johnson, despite her frequent requests for updates.

69. The dishonest performance warnings and performance review caused Ms. Barakat to lose an opportunity to pursue a promotion that would have increased her compensation.

70. Because of Walgreens' discriminatory and hostile treatment and the consequent severe emotional distress Ms. Barakat was suffering, she advanced the planned schedule for cataract surgeries on both eyes to February 2020.

71. There was no medical reason for Ms. Barakat to have cataract surgery in February 2020. Ms. Barakat scheduled the surgery only because she could no longer tolerate going to work and being subjected to ongoing harassment in a hostile work environment.

72. Ms. Barakat's cataract surgery on her right eye was unsuccessful, resulting in further vision loss, totally and permanently disabling her from working.

73. Ms. Barakat has experienced and continues to experience significant emotional distress due to the discriminatory and hostile treatment she has been subjected to.

74. Ms. Barakat has experienced ongoing symptoms of emotional distress, including, but not limited to, chest pain, depression, anxiety, insomnia, loss of appetite, and loss of self-worth. Her emotional distress has also negatively affected her relationship with her family and her overall enjoyment of life.

**COUNT I**
**(Race and National Origin Discrimination Under G.L. 151B)**

75. Ms. Barakat repeats and realleges the above paragraphs as if fully set forth herein.

76. Ms. Barakat is a member of a protected class (Arab and foreign national).

13

77. She performed her job at a satisfactory level.

78. As set forth above, Ms. Johnson's derogatory remarks about Ms. Barakat's national origin and race constitute direct evidence of discriminatory animus against Ms. Barakat.

79. As set forth above, Ms. Barakat has been subjected to discrimination by Walgreens based on her race and national origin. Ms. Barakat has suffered adverse actions, including but not limited to dishonest negative performance reviews, lost opportunities, and a hostile work environment.

80. Because she could no longer tolerate the ongoing discrimination by Walgreens, Ms. Barakat underwent elective surgery as a means of extricating herself from an intense hostile environment. The elective surgery totally disabled Ms. Barakat, preventing her from working.

81. As a result of Walgreens' unlawful discrimination, Ms. Barakat has suffered emotional distress and other damages, including but not limited to lost opportunities.

## COUNT III
### (Handicap Discrimination)

82. Ms. Barakat repeats and realleges the above paragraphs as if fully set forth herein.

83. Ms. Barakat had a serious medical condition that substantially impaired one or more of her major life activities (vision).

84. Ms. Barakat was able to perform the essential functions of her position with one or more reasonable accommodations of minimizing her night schedule and working at close range on her computer.

85. Walgreens was aware of Ms. Barakat's disability.

86. Walgreens discriminated against Ms. Barakat based on her disability by, among other things, demanding that she modify her work schedule to take more night shifts and subjecting her to ongoing harassment.

## COUNT III
### (Retaliation)

87. Ms. Barakat repeats and realleges the above paragraphs as if fully set forth herein.

88. After being subjected to discriminatory treatment, Ms. Barakat complained to Walgreens' HR department on multiple occasions. These complaints were protected conduct.

89. Walgreens retaliated against Ms. Barakat in several ways because she engaged in protected conduct, including, among other things, forcing her to work night shifts despite her disability, negative reviews that were dishonest, disciplining her in bad faith, stripping her of training opportunities that would have advanced Ms. Barakat's career, and subjecting her to a hostile work environment.

90. As a result of Walgreens' unlawful retaliation, Ms. Barakat has suffered emotional distress and other damages, including but not limited to lost opportunities.

## COUNT IV
### (Hostile Work Environment)

91. Ms. Barakat repeats and realleges the above paragraphs as if fully set forth herein.

92. At all relevant times, Ms. Barakat was disabled and a member of a protected class.

93. Because of her disability, race, and national origin, Ms. Barakat was subjected to intimidation, humiliation, and stigmatization.

94. This conduct was so severe and pervasive that it altered Ms. Barakat's work conditions and created an abusive work environment.

95. The harassment suffered by Ms. Barakat was objectively and subjectively offensive.

96. As a result of this hostile work environment, Ms. Barakat has suffered emotional distress and other damages, including but not limited to lost opportunities.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues and claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Rawan Barakat respectfully prays that the Court:

1. Enter judgment in favor of Plaintiff on all counts, ordering that Defendant pay multiple damages in the amount determined at trial, plus interest, costs, attorneys' fees, and punitive damages; and,

2. Grant such other relief as is just and proper.

Respectfully submitted,

**RAWAN BARAKAT**

By her attorneys,

Gary M. Feldman (BBO#162070)
Davis, Malm & D'Agostine, P.C.
One Boston Place - Suite 37
Boston, MA 02108
(617) 367-2500
gfeldman@davismalm.com

Dated: May 26, 2022

| Summons | CIVIL DOCKET NO.<br>2284CV01166F | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|
| CASE NAME:<br>Rawan Barakat<br><br>vs.<br><br>Walgreens Co.<br><br>Plaintiff(s)<br><br>Defendant(s) | | Michael Joseph Donovan    Clerk of Courts<br>Suffolk    County<br>COURT NAME & ADDRESS:<br>SUPERIOR CIVIL COURT<br>SUFFOLK COUNTY COURTHOUSE<br>THREE PEMBERTON SQ. 12th Floor<br>BOSTON, MASSACHUSETTS 02108 |

THIS SUMMONS IS DIRECTED TO ___Walgreens Co.___ (Defendant's name)

You are being sued. The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the Suffolk Superior Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

    a) Filing your **signed original** response with the Clerk's Office for Civil Business, Suffolk Superior Court 3 Pemberton Sq., 12 Fl., Boston, MA 02108 (address), by mail or in person **AND**

    b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: Gary M. Feldman, Esq., Davis, Malm & D'Agostine, P.C., One Boston Place, 37th Fl., Boston, MA 02108

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

### 4. Legal Assistance.

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

### 5. Required Information on All Filings:

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger , Chief Justice on _____, 20\_\_\_\_ . (Seal)

Clerk-Magistrate *[signature]*
Michael Joseph Donovan

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

### PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ , I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

*I am authorized to accept service on behalf of Defendant,*

Dated: June 3, 2022    Signature: *[signature]*

Ryan W. Jaziri, Esq.
Counsel for Defendant

**N.B.   TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date:

rev. 1/2019